**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **BRENDA L. MCELROY** | **CIVIL ACTION NO. 13-1348** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **PHM CORPORATION** | **MAG. JUDGE KAREN L. HAYES** |

**RULING**

This is an employment discrimination case brought by Plaintiff Brenda L. McElroy ("McElroy") against her former employer, Defendant PHM Corporation ("PHM"). McElroy asserts a claim of race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and a claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

Pending before the Court is a Motion for Summary Judgment [Doc. No. 23] filed by PHM. McElory filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment. [Doc. No. 27]. PHM filed a Reply Memorandum [Doc. No. 28].

For the following reasons, PHM's motion is GRANTED, and McElory's claims are DISMISSED WITH PREJUDICE.

**I. FACTS AND PROCEDURAL HISTORY**

PHM is a Monroe, Louisiana-based company which manages commercial properties, including two long-term care facilities, The Guest House and The Oaks. The Oaks is a facility which provides long-term care and nursing services in a home-like environment. In May, 2011, The Oaks had 127 residents.

McElroy, who is African-American, began working for PHM in March of 2007 and became a full-time van driver for The Oaks one month later.

In June 2007, she was transferred to a position in Activities with a concurrent pay increase from $6.50 to $7.00 per hour. PHM characterizes the transfer as a promotion and identifies her job title as Assistant Activities Director. However, McElroy points out that she was referred to as an Activities Director in personnel records.

In her new position, McElroy's duties included planning and supervising activities for the memory loss (or Alzheimer's) unit at The Oaks,[1] also known as Eden Place. This unit had approximately 15-20 beds. McElroy also assisted with other activities for residents in the general population. The Activities Director, Regina White (who is Caucasian), planned activities for all The Oaks residents, approximately 100 persons, including those in the Alzheimer's unit. Prior to McElroy's transfer to the Activities position, White planned and supervised all resident activities. Activities included daily exercise, games, social events, multi-denominational church services, field trips, dances, monthly birthday parties, and in-room activities.

Following her transfer to Activities, McElroy received two additional annual pay increases.

---

[1] McElroy does not contradict PHM's argument and evidence that she was promoted to Assistant Activities Director in June, 2007, and she testified that she thought the Alzheimer's Unit "came into play in 2008, if I'm not mistaken." [Doc. No. 28, McElroy Depo., p. 70]. However, she now declares in support of her opposition memorandum that the Alzheimer's Unit was not operational until 2009. [Doc. No. 27, Exh. 1, McElroy Declaration]. However, "[i]t is well settled that [the United States Court of Appeals for the Fifth Circuit] does not allow a party to defeat a motion for summary judgment using an affidavit [or declaration] that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *see also Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 233 n. 9 (5th Cir. 1984) ("The nonmoving party cannot defeat a summary judgment motion by attempting to create a disputed material fact through the introduction of an affidavit that directly conflicts with his prior deposition testimony."). Accordingly, the Court does not consider McElroy's contradictory statement that the Alzheimer's Unit was not created until 2009 as competent summary judgment evidence.

By May, 2009, McElroy's pay had increased to $8.75 per hour[2] and remained at that hourly rate until the end of her employment. White was paid $10.00 per hour.

In December 2010, McElroy began experiencing heavy bleeding and severe cramping during her menstrual cycle. She made appointments with her physician in February 2011 to discuss the condition. Although she rescheduled twice because of work, she was able to see her physician on February 24, 2011. That same week, McElroy's supervisor, Administrator Megan Terrell ("Terrell"), a Caucasion, allowed her to take two days off from work because of her condition.[3] McElroy was paid for those days, and her absences were excused. She returned to work on Monday, February 28, 2011.

Although Terrell was the Administrator at The Oaks, she reported to Dena LaBorde (who is Caucasian), PHM's Director of Operations. On Tuesday, March 1, 2011, LaBorde was at The Oaks to conduct a facility audit for survey readiness, which was necessary for licensing and accreditation purposes. McElroy arrived at work that morning around 9:00 a.m. LaBorde saw McElroy near the facility's back entrance, and they briefly spoke. At that time, McElroy was in good spirits and mentioned that she had gotten a good price on several king cakes that she purchased on her way into work for a Mardi Gras party.

Later that morning, however, McElroy began experiencing menstrual cramping and bleeding.

---

2 In her declaration, McElroy states that she was making $8.85 per hour at the time of her resignation, but that amount appears to be the result of a clerical error because she testified, consistently with PHM's evidence, that she was making $8.75 per hour. [Doc. No. 23, McElroy Depo., p. 18].

3 Although not entirely clear, it appears that McElroy took off the day of her appointment and one additional day, but, regardless, it is undisputed that she was paid for two days of sick leave the week before her resignation.

Some time around noon, McElroy entered Terrell's office, but found only LaBorde present. McElroy told LaBorde that she was not feeling well and needed to go home. McElroy claims that LaBorde agreed she should go home. However, it is undisputed that LaBorde said that Terrell would be returning to the office shortly, indicating that McElroy should discuss the situation with her. At some point, McElroy and LaBorde talked about whether McElroy should take or had taken some type of over-the-counter pain medication. LaBorde also suggested that McElroy put her feet up.[4]

After Terrell returned, she and McElroy also discussed McElroy's condition. LaBorde was present only for the first few minutes when McElroy told Terrell that she was having cramps and bleeding[5] and asked to go home. After LaBorde left the office, McElroy and Terrell continued talking. It is undisputed that Terrell asked McElroy to remain until 3:00 p.m., when the audit would be completed. Terrell testified that she asked McElroy to "hang in there" until 3:00 p.m. when the survey was scheduled to end. According to Terrell, she was trying to encourage McElroy by telling her to "smile" and return to her unit. McElroy testified that she told Terrell that she was weak from heavy bleeding and needed to leave, but Terrell would not give her permission to leave before 3:00 p.m. McElroy testifies and declares that Terrell told her that if she left to go to the doctor that she would not have a job when she got back. [Doc. No. 23, McElroy Depo., p. 106; Doc. No. 27, Exh. 1]. McElroy recalls Terrell saying that she should "pin a smile on her face" and go "do your job." [Doc. No. 23, McElroy Depo., p. 106].

---

[4] It is unclear if McElroy and LaBorde had this portion of the discussion before or after Terrell returned, but the substance of their conversation is not seriously disputed.

[5] In her affidavit, LaBorde avers that McElroy told Terrell that she was "sick," but it does not appear seriously disputed, at least for purposes of summary judgment, that Terrell was aware of the nature of McElroy's condition. [Doc. No. 23, Exh. 26-4].

Although McElroy returned to work, her heavy bleeding continued and caused staining on her pants. McElroy returned to Terrell's office, but saw Terrell close the blinds as she approached. McElroy contends that the door was locked, and no one answered when she knocked.[6]

McElroy believed that she would be disobeying a direct order if she left, but felt that she could not remain in public. Therefore, at approximately 1:40 p.m.,[7] McElroy went to Tamika Butler ("Butler"), the Human Resources Representative, and told her that she did not feel well. McElroy gave Butler a letter for Terrell and then left work without speaking to LaBorde or Terrell again. After leaving, McElroy went to her physician's office for treatment for cramps and menstrual bleeding.

At approximately 3:00 p.m., Terrell received and reviewed the letter from McElroy. The letter stated: "This is a notice of resignation, date effective now. Thanks for the opportunity to work for you." [Doc. No. 23, McElroy Depo.,[8] p. 49 and Exh. 9]. At the time of her resignation, McElroy had accrued 15 hours of paid time off.

On or about March 14, 2011, McElroy had a hysterectomy and has not had any further problems.

On June 28, 2011, McElroy filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that PHM discriminated against her on the basis of

---

[6] The Court accepts McElroy's representations as true for purposes of summary judgment, but recognizes that these statements may be disputed at trial.

[7] The time clock indicated that McElroy "clocked out" at 1:40 p.m., and McElroy has no reason to believe that this time was incorrect. [Doc. No. 23, McElroy Depo., p. 56].

[8] McElroy's deposition is not identified by exhibit number, but is one of the attachments to PHM's Motion for Summary Judgment. Her resignation letter was attached as Exhibit 9 to the deposition.

her race. The EEOC issued a notice of right to sue on March 4, 2013, and McElroy filed suit in this Court on June 3, 2013.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B. Race Discrimination under Title VII**

Title VII prohibits an employer from discharging or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). In this case, McElroy asserts that she was subjected to race discrimination in two way: (1) pay disparity while she was employed by PHM and (2) constructive discharge.

Under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), a plaintiff presents a *prima facie* case of discrimination by establishing that: (1) she is a member of a protected group or class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). The fulfillment of the *prima facie* case "raises an inference of discrimination" because the Court can presume these acts, if otherwise unexplained, are "more likely than not" based on the consideration of an impermissible consideration of race. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Once the plaintiff establishes her *prima facie* case, "the employer must respond with a legitimate, nondiscriminatory reason for its decision. This burden on the employer is only one of production, not persuasion, involving no credibility assessments." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219*,* 222 (5th Cir. 2000).

When the employer satisfies this requirement, the burden of proof then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead pretext for

discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed motive alternative."). *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004)(internal citations omitted).

**1. Adverse Employment Action Other than Pay Disparity**

It is undisputed that McElroy can establish the first two elements of her prima face case because she is African-American, and she was qualified for her position. However, PHM contends that she cannot show that she suffered an adverse employment action (other than her pay disparity claim, which will be addressed separately).

For Title VII discrimination claims, adverse employment actions "'include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002))[9]. In this case, PHM argues that McElroy cannot establish that she was constructively discharged or that she was denied leave.

**a. Constructive Discharge**

First, McElroy claims she was constructively discharged from her employment at PHM. A

[9] The Fifth Circuit's precedent recognizing only "ultimate employment decisions" as actionable adverse employment actions in the discrimination context was unaffected by the Supreme Court's ruling in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 61–65 . . . (2006), which abrogated the "ultimate employment decision" standard in the **retaliation** context. Thus, the "ultimate employment decision" standard remains controlling for Title VII . . . discrimination claims.

*McCoy*, 492 F.3d at 560 (emphasis added). Accordingly, the Court applies the *pre-Burlington* precedent to McElroy's race discrimination claims.

constructive discharge is an adverse employment action actionable under Title VII. *See Thomas v. Atmos Energy Corp.*, 223 Fed.Appx. 369, 276 n.2 (5th Cir. 2007); *Wells v. City of Alexandria*, No. 03-30750, 2004 WL 909735, at *3 (5th Cir. 2004) ("Under federal law, the constructive discharge doctrine is an alternative way of proving an adverse employment action in Title VII . . ., but constructive discharge is not itself a cause of action. It is a means of proving the element of an adverse employment action where the employee quits instead of being fired.").

However, to establish constructive discharge, a plaintiff must show the "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Lauderdale v. Tex. Dep't of Crim. Justice*, *Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007) (citation omitted). Although a plaintiff is not required to demonstrate an employer intended to force her resignation, proving constructive discharge requires a greater degree of harassment than a hostile-work-environment claim. *Id.* Factors to consider when determining whether an employee was constructively discharged include (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement (or continued employment on terms less favorable than the employee's former status). *McCoy,* 492 F.3d at 557.

In this case, even viewing the evidence in the light most favorable to McElroy, she has failed to raise a genuine issue of material fact for trial as to whether she was constructively discharged. At worst, Terrell threatened McElroy that if she left work on the day in question before 3:00 p.m. she would not have a job. This simply does not constitute constructive discharge. Prior to her resignation, McElroy had suffered no changes to her employment or harassment at all. In fact, she

had been permitted to take time off the previous week for the same condition. Even if PHM's policy typically required McElroy to speak with her supervisor and she was unable to do so, there is no reason she could not have explained the situation to either LaBorde or Butler, the same Human Resources representative to whom she presented her resignation letter. The law does not permit a plaintiff to preemptively resign and then call her resignation a constructive discharge without more. Thus, McElroy cannot establish that she suffered an adverse employment action in the form of a constructive discharge.

**b. Denial of Leave**

Alternatively, McElroy contends that she was denied leave and that such denial constituted an adverse employment action sufficient to satisfy the third element of her *prima facie* case. However, in this case, it is also undisputed that she was delayed, not denied, leave.

When her condition worsened, McElroy did not discuss the situation with anyone, so no one at PHM, including Terrell, could have "denied" her leave. Thus, she cannot establish an adverse employment action on this basis either.

Given McElroy's failure to establish the third element, she cannot meet her prima facie burden.

**2. More Favorable Treatment with Regard to Leave**

Even assuming *arguendo* that McElroy could show that she suffered an adverse employment action, she has also failed to raise a genuine issue of material fact for trial on the fourth element. She has not shown that persons outside her protected race class received more favorable treatment.

In her deposition, McElroy claimed that the Activities Director, Regina White ("White"), a Caucasian, was "allowed medical leave as needed." [Depo., p. 132]. However, she offered no

evidence to support her allegation, or that any Caucasian employees received more favorable treatment. She did not dispute that she had also been allowed to take leave, contending only that she had to reschedule sometimes because of work issues.

Under these circumstances, McElroy cannot establish the fourth element of her *prima facie* case, and PHM is entitled to summary judgment on her race discrimination claim related to her resignation and leave request.

**3. Pay Disparity**

McElroy does claim that she suffered an adverse employment action because she suffered pay disparity based on her race. She alleges that she was paid "lower wages than white persons performing equivalent job duties" and that "replaced by a white female who began her duties at a higher salary rate." [Doc. No. 1, ¶¶ 9-10].

"To make out a prima facie case of discrimination in compensation, a plaintiff must show that [s]he was a member of a protected class and that [s]he was paid less than a non-member for work requiring substantially the same responsibility." *Taylor v. United Parcel Service, Inc.*, 554 F.3d 510, 522 (5th Cir. 2008) (citing *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984)). A plaintiff's prima facie evidence must show that her "pay was lower than specific employees who are not members of the protected class." *Id.* at 523. Further, the plaintiff "has the burden of demonstrating that 'the employment actions at issue were taken under nearly identical circumstances.'" *Frazier v. Sabine River Authority La.*, 509 Fed. App'x. 370 (5th Cir. 2013) (quoting *Turner v. Kan. City S. Ry.*, 675 F.3d 887, 893 (5th Cir. 2012)). The Fifth Circuit has explained that "nearly identical circumstances" are those where the comparator employees "'held the same job or responsibilities, shared the same supervisor, or had their employment status determined by the same

person, and have essentially comparable violation histories.'" *Id.*

If plaintiff meets her prima facie burden, then the employer must produce a legitimate non-discriminatory reason for the pay disparity. *Id.* at 522 (citing *Ross v. University of Texas at San Antonio*, 139 F.3d 521, 525 (5th Cir. 1998) (internal quotation marks omitted)). Then, if the employer meets its burden of production, under the *McDonnell Douglas* framework, the plaintiff must produce sufficient evidence to show pretext.

In support of her claims of wage disparity, McElroy asserts that she should have been paid the same as White, the Activities Director. She avers that she and White both initially worked in the Alzheimer's unit at The Oaks, but that Terrell, who supervised both employees, allowed White to discontinue her duties there because it was too depressing for her.[10] According to McElroy, she was solely responsible for activities in the Alzheimer's unit, comprised of approximately 20 residents, but she and White both worked in the general population of approximately 80 residents.

PHM agues that McElroy cannot establish that she and White were similarly situated. PHM contends that White had more seniority and greater job responsibilities. White was hired in November 2005 as an Assistant Activities Director at $7.50 per hour and was employed by PHM for 1 ½ years before McElroy was hired as a van driver. Although PHM agrees that McElroy was responsible for activities for the Alzheimer's unit and that she sometimes serviced clients outside the Alzheimer's unit, PHM contends the evidence clearly demonstrates that White was responsible for activities for all 100 residents, and she serviced far more residents in the general population than McElroy.

---

[10] In her deposition, McElroy testified that White found work in the Alzheimer's unit depressing because her father had the same condition.

In support, PHM provided activities notes and care plan sign-in sheets for residents living at The Oaks between January 2010 and June 2011, which were reviewed and attested to by LaBorde. Those documents showed that McElroy did sometimes service residents outside of the Alzheimer's Unit, but that White serviced far more residents than McElroy. Although McElroy disputed the accuracy of the documents during her deposition, she has provided no evidence to contradict them. In the declaration filed with her opposition memorandum, McElroy again states that she and White divided the activities duties with "residents in the general population," often working with "the same persons on different dates." [Doc. No. 27, Exh. A, McElroy Declaration]. While that statement may well be accurate, based on the documents provided to the Court, she has provided no evidence to show that she and White worked with the same *number* of residents.[11]

Under these circumstances and given White's longer tenure of employment by PHM and specifically in the activities area, the Court finds that McElroy has failed to establish that she and White were employed in "nearly identical circumstances."

Finally, McElroy has also argued that she suffered wage disparity because she was replaced by a Caucasian employee who was paid a higher hourly rate. However, given the Court's conclusion that McElroy was not constructively discharged, she cannot claim damages based on her "replacement."[12] PHM's Motion for Summary Judgment on McElroy's wage disparity claim is

---

[11] This conclusion remains valid, even if, as McElroy argues, she and White had the same job title. She is correct that she is listed as an Activities Director, not Assistant Activities Director, in personnel records, but the objective evidence shows that, regardless of job title, she and White were not nearly identical.

[12] Even if the Court were to consider the wages paid to others in the Activities positions, those wages do not provide evidence of race discrimination. In March 2004, the Activities Director position at The Oaks was held by Ocie Jones, an African-American male, who was paid $10.00 per hour, the same rate paid to White. [Doc. No. 23, Exh. 26, ¶ 15]. Although McElroy contends

GRANTED, and this claim is also DISMISSED.

### C. FMLA

A plaintiff asserting a claim under the FMLA must do so within two years of the last violation. 29 U.S.C. § 2617(c)(1). If the plaintiff can show that the violation is willful, however, the statute of limitations is extended to three years. 29 U.S.C. § 2617(c)(2). To establish a willful violation of the FMLA, a plaintiff must show that his employer "'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.'" *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed. App'x. 387, 392-93 (5th Cir. 2005) (quoting *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33 (1st Cir.2003)(citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

It is undisputed that the alleged FMLA violation took place on March 1, 2011, and McElroy did not file suit until June 3, 2013, more than two years later. McElroy argues that her claim is not time barred because PHM "willfully" violated the FMLA by "never contacting" her after her

---

that there was no record of any pay increase from Jones' starting hourly wage of $5.15 per hour, PHM provided an affidavit from LaBorde in which she avers that Jones earned $10.00 per hour as Activities Director. LaBorde's affidavit is competent summary judgment evidence which McElroy has failed to oppose with evidence to the contrary.

Likewise, LaBorde has attested that Jones' successor, Debbie Dickerson, a Caucasian female, was actually paid *less* than Jones at $9.75 per hour. *Id.* McElroy complains that Dickerson's hourly rate was not listed on a chart provided in discovery, but PHM states that Dickerson's personnel file was made available to McElroy. At any rate, McElroy has not provided any evidence contesting LaBorde's affidavit.

Finally, after McElroy's resignation, McElroy's immediate successor, Christina Clark, a Caucasian female was paid $8.50 per hour during the two months she assisted with activities at The Oaks, less than the hourly rate paid to McElroy. [Doc. No. 23, Exh. 26, ¶ 27]. Thus, even if McElroy could make out a *prima facie* case, the evidence does not otherwise support her claim of wage disparity based on race.

resignation to "ask what was going on with her health." [Doc. No. 27, p. 12].

However, there is no requirement under the FMLA that an employer contact an employee and offer leave after she has resigned. The undisputed evidence shows that in the week prior to her resignation, McElroy took two days of leave for the same condition. There is no evidence on the day of McElroy's resignation that Terrell actually denied her leave altogether. Even when viewed in the light most favorable to McElroy, the facts are, at worst, that Terrell threatened McElroy with discharge unless she stayed at work for approximately three more hours. It is undisputed that McElroy did not speak with Terrell or LaBorde after her condition worsened about 1 ½ hours later that same day. Thus, there is no evidence that she would have been denied leave at all. This evidence is insufficient to show that PHM knew or showed reckless disregard whether its conduct, through Terrell, violated the FMLA. Thus, McElroy's FMLA claim was not timely filed, and PHM's Motion for Summary Judgment on her FMLA claim is GRANTED.

## III. CONCLUSION

For the foregoing reasons, PHM's Motion for Summary Judgment is GRANTED, and McElroy's claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 21st day of November, 2014.

Robert G. James

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE